**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
VICTOR PADUANO, FRANK SCALA, NICK
CANNER on behalf of themselves and other
similarly situated individuals, and HM
COMPOUNDING SERVICES, LLC,

                    Plaintiffs,

               -against-

EXPRESS SCRIPTS, INC. CVS CAREMARK
CORP., OPTUMRx, INC., and PRIME
THERAPEUTICS LLC,

                    Defendants.
--------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
14-CV-5376 (ADS)(ARL)

<u>**APPEARANCES:**</u>

**Jaspan Schlesinger LLP**
*Attorneys for the Plaintiffs*
300 Garden City Plaza
Garden City, NY 11530
    By:  Steven R. Schlesinger, Esq.
          Stanley A. Camhi, Esq.
          Jessica M. Baquet, Esq.
          Shannon E. Boettjer, Esq.
          Daniel E. Shapiro, Esq., Of Counsel

**Husch Blackwell LLP**
*Attorneys for the Defendant Express Scripts, Inc.*
190 Carondelet Plaza, Suite 600
Saint Louis, MO 63105
    By:  Christopher Smith, Esq.
          Jason Husgen, Esq.
          Sarah Hellmann, Esq., Of Counsel

**Cozen O'Connor**
*Attorneys for the Defendant Express Scripts, Inc.*
45 Broadway, Suite 1600
New York, NY 10006
    By:  Menachem J. Kastner, Esq.
          Ally Hack, Esq., Of Counsel

**Foley & Lardner LLP**
*Attorneys for the Defendant CVS Caremark Corp.*
90 Park Avenue
New York, NY 10016
    By:   Yonaton Aronoff, Esq.
          Michael D. Leffel, Esq.
          Connor A. Sabatino, Esq., Of Counsel

**Dorsey & Whitney, LLP**
*Attorneys for the Defendant OptumRx, Inc.*
250 Park Avenue
New York, NY 10177
    By:   Richard H. Silberger, Esq.
          Christopher George Karagheuzoff, Esq.
          Dai Wai Chin Feman, Esq., Of Counsel

**Dykema Gossett PLLC**
*Attorneys for the Defendant Prime Therapeutics LLC*
2723 South State Street, Suite 400
Ann Arbor, MI 48104
    By:   Jill M. Wheaton, Esq.

**Aaronson, Rappaport, Feinstein & Deutsch**
*Attorneys for the Defendant Prime Therapeutics LLC*
600 Third Avenue
New York, NY 10016
    By:   Peter Joseph Fazio, Esq.

**SPATT, District Judge.**

This multi-party antitrust action is brought by the Plaintiff HM Compounding Services, LLC ("HMC") and three individuals, Victor Paduano ("Paduano"), Frank Scala ("Scala"), and Nick Canner ("Canner")(collectively the "Individual Plaintiffs"), on behalf of themselves and all others similarly situated, who desire to purchase compound medications from HMC.

According to the complaint, the Individual Plaintiffs purchase compound medications from HMC, which operates one of the largest compounding pharmacies in the Eastern United States. HMC provides custom-made medications, i.e., compounded medicines, to numerous patients, including pediatric patients who cannot take pill versions of particular drugs; patients

that cannot tolerate one or more ingredients in manufactured drugs; drugs that are no longer manufactured but are still determined to be safe and effective; and compounds for particular types of treatment, including pain management, dermatological specialties, biologically identical hormone replacement, sexual dysfunction and enhancement; compounds for autism; compounds for weight management; and compounds for veterinary use.

The named defendants – Defendants Express Scripts, Inc. ("ESI"), CVS Caremark Corporation, now known as "CVS Health Corporation"("Caremark"), Optum Rx, Inc. ("Optum"), and Prime Therapeutics, LLC ("Prime")(collectively the "Defendants") – are or are affiliated with prescription benefit managers ("PBMs"). PBMs administer the prescription pharmaceutical portion of healthcare benefit programs, which are typically purchased by a plan sponsor. As part of their functions, PBMs provide bundled services related to the administration of pharmaceutical benefits, including claims adjudication, formulary design, management and negotiation of branded drug rebates; management and negotiation of networks of retail pharmacies; review of drug utilization; processing claims from pharmacies for payment; and the operation of specialty and home-delivery pharmacies such as mail order pharmacies used to dispense medications directly to patients. Some chain pharmacies, such as CVS, have merged with PBMs.

Collectively, the Defendants dominate the PBM market in the United States with a market share of more than 80%. The Defendant ESI is the largest PBM and the Defendant Caremark is the second largest PBM.

In short, the Plaintiffs allege that the Defendants have engaged in a concerted and coordinated effort to eliminate HMC, and other independent compounding pharmacies, as competitors in the prescription benefit drug market by placing unwarranted and illegal

restrictions on patient access to compounded medications.

Although not emphasized by the complaint, the relationships between HMC and the respective defendant-PBMs are each governed by a Pharmacy Network Agreement. The HMC agreement with Caremark (the "Caremark Provider Agreement"), the HMC agreement with Optum (the "Optum Provider Agreement"), and the HMC agreement with Prime (the "Prime Provider Agreement") each contain or incorporate an arbitration provision for resolving disputes arising therefrom. The HMC agreement with ESI (the "ESI Provider Agreement") contains a forum selection clause for resolving disputes arising therefrom.

Presently pending before the Court are a number of motions, including separate motions by Caremark, Optum, and Prime to sever HMC's claims against them and to refer those claims to arbitration. Also pending before the Court is a motion by ESI to sever HMC's claims against it and transfer those claims to the contractually-designated forum in Missouri.

## I.    BACKGROUND

A.  Factual History

The Court first recounts the termination of the contractual relationships between HMC and each of the Defendants, save for Prime, which has not terminated its contractual relationship with HMC. Unless stated otherwise, the following facts are drawn from the complaint.

1.   The Termination of the Caremark Provider Agreement

By letter dated June 30, 2014, Caremark informed HMC of an "ongoing audit" of its pharmacy "covering the period of April 2013 through September 30, 2013." (Compl., at ¶ 55.) That "ongoing audit" had not been previously disclosed to HMC. In that letter, Caremark informed HMC that "CVS Caremark is placing your pharmacy under payment and adjudication suspension" effective immediately based upon purported "compliance issues" identified in the

ongoing audit. (Id.) Caremark informed HMC that, pursuant to this decision, HMC "may not submit claims to Caremark for adjudication" and that "future cycle checks for prior claims will be withheld pending resolution of our audit review." (Id.) Accordingly, effective June 30, 2014, Caremark stopped paying claims submitted by HMC and precluded HMC from submitting any future claims.

By letter dated July 16, 2014, HMC addressed its stated audit concerns, and requested that Caremark reinstate HMC. By letter dated July 28, 2014, Caremark denied HMC's request to reconsider the payment and adjudication suspension placed upon HMC. In that letter, Caremark admitted that it had instituted a policy of rejecting compounded prescriptions and requiring prior authorizations "based upon plan edits." (Id. at ¶ 56.) No information about the "plan edits" was provided in that letter, nor were those "plan edits" disclosed to HMC prior to the termination letter. (Id.) Caremark also stated: "We do not believe that there is any patient harm with our decision to suspend payment and claims adjudication for HM Compounding . . ." (Id.)

2. The Termination of the Optum Provider Agreement

On or about August 15, 2013, a pharmacy services administrative organization, Wholesale Alliance TPS LLC DBA Third Party Station ("TPS") entered into the Optum Provider Agreement with Optum. TPS entered into the Agreement "on behalf of itself and each of the Pharmacies" in TPS's network, including HMC. (Doc No. 39, Ex. A, at 1.)

By Termination Letter dated March 3, 2014, Optum informed Third Party Station ("TPS"), a Third Party Administrator in Optum's prescription benefit program, that HMC was being terminated as a network provider because the Pharmacy Network Agreement "prohibits delivering, shipping, mailing and/or dispensing Covered Prescription Services to members" and demanded that HMC cease and desist from engaging in such activity. (Compl. at ¶ 51.)

By letter dated March 17, 2014, attorneys for HMC responded to that termination letter, explaining that the contract provision cited by Optum did not prohibit "delivering, shipping" and or "dispensing" prescription services to members, nor could it if it were to comply with governing legal and ethical requirements for these services under New York law.

By letter dated May 29, 2014, Optum responded to that letter by asserting that HMC's contract was being terminated immediately "for cause" on the basis that the "that mailing, shipping and or delivering of Covered Prescription Services is not allowed under the retail contract with [Optum]." (Id. at ¶ 52.)

Subsequently, by letters dated June 25, 2014, Optum informed HMC that it was terminating "for cause" the Optum Provider Agreement due to alleged "Fraud, Waste and Abuse" for purportedly engaging in "prescription splitting to obtain multiple dispensing fees, etc." (Id. at ¶ 54.)

By letter dated July 16, 2014, HMC explained that it was not "splitting" prescriptions and receiving multiple dispensing fees and requested that the contract be reinstated until an appeal hearing on the issue was held. Optum denied that request, allegedly causing HMC money damages.

3. The Termination of the ESI Provider Agreement

By letter dated July 22, 2014, HMC informed ESI that it had become aware that ESI was directly notifying providers that they were not to continue prescribing compounded medications even if it was in the patient's best interest to receive compounded medicine.

On July 31, 2014, ESI sent HMC a "notice of immediate termination" of the ESI Provider Agreement. In its letter, ESI alleged that HMC had purportedly made material

misrepresentations to ESI regarding collecting patients' co-payments and, as a result, was terminating HMC's contract immediately.

By letter dated August 1, 2014, ESI responded to HMC's July 22, 2014 letter. In that letter, ESI did not deny making such statements to prescribing physicians; rather, it took the position that ESI "has a legal right to communicate with providers regarding benefit coverage issues." (Id. at ¶ 57.)

B. Procedural History

On September 10, 2014, the Individual Plaintiffs, on behalf of themselves and all others similarly situated, and HMC commenced this action in the Supreme Court of the State of New York, County of Nassau. The complaint asserts causes of action for (1) fraud and misrepresentation; (2) deceptive trade practices in violation of New York General Business Law ("NYGBL") § 349; (3) antitrust law violations under NYGBL § 340 (the "Donnelly Act"); and (4) unfair insurance practices based on alleged violations of state statutes, including New York State Insurance Law § 2401, et seq.. The complaint also seeks permanent injunctive relief.

On September 10, 2014, the Plaintiffs brought an order to show cause seeking the issuance of a temporary restraining order. Following a hearing beginning on September 10, 2014 and continued on September 11, 2014, the Hon. Stephen A. Bucario issued an order enjoining the Defendants from, among other things, (1) denying compound prescription drug-ingredient insurance coverage and (2) denying prescription drug benefit coverage to a putative nationwide class of individuals filling prescriptions for compound drugs at HMC and other pharmacies.

On September 12, 2014, based on traditional diversity jurisdiction, the Class Action Fairness Act ("CAFA"), Pub. L. No. 109–2, 119 Stat. 4 (2005), codified in part at 28 U.S.C. § 1332(d), and federal question jurisdiction, the Defendants removed this action to this Court.

On September 15, 2014, ESI filed a motion by order to show cause to sever HMC's claims against ESI and to transfer those claims, pursuant to 28 U.S.C. 1404(a) and a forum selection clause in the ESI Provider Agreement, to the United States District Court for the Eastern District of Missouri.

Also, on September 15, 2014, ESI moved by order to show cause to vacate the temporary restraining order ("TRO") issued on September 11, 2014.

On September 22, 2014, the Plaintiffs moved by order show cause to hold the Defendants in contempt for their alleged failure to abide by the September 11, 2014 TRO.

On September 23, 2014, Caremark moved, pursuant to Section 1 of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA"), by order to show cause to sever HMC's claims against it and to compel arbitration of those claims against based on an arbitration provision incorporated in the Caremark Provider Agreement.

Also, on September 23, 2014, Caremark moved by order to show cause to vacate the September 11, 2014 TRO.

On September 24, 2014, Optum moved by order to show cause, pursuant to Section 1 of the FAA and Fed. R. Civ. P. 21, to sever HMC's claims against it and to compel arbitration of those claims in Los Angeles, California.

In addition, on September 24, 2014, Optum filed an emergency motion by order to show cause to vacate the September 11, 2014 TRO.

On September 25, 2014, the Plaintiffs filed an emergency motion for an order to extend the September 11, 2014 TRO and to schedule a hearing.

On September 26, 2014, Prime moved to join the pending motions to vacate the September 11, 2014 TRO.

On September 29, 2014, with each party represented, the Court held oral argument on the pending motions. At the conclusion of that hearing, the Court extended the September 11, 2014 TRO for fourteen days, but allowed the parties to submit proposed modifications. The Court referred the pending motions for contempt and for a preliminary injunction to United States Magistrate Judge Arlene R. Lindsay.

Later that afternoon, the parties appeared before Judge Lindsay, who directed the parties to submit a proposed expedited briefing schedule to this Court in connection with the motions to transfer venue and compel arbitration. Judge Lindsay stayed a determination of the motions for contempt and for a preliminary injunction pending a determination of the motions not referred by this Court.

On October 1, 2014, Prime moved pursuant to Fed. R. Civ. 12(b)(6) to dismiss the complaint as against it, or, in the alternative, to compel arbitration of HMC's claims against it in Minnesota and to stay this matter until that dispute was resolved, or, in the alternative, to sever Prime from this case pursuant to Fed. R. Civ. P. 21.

Also, on October 1, 2014, ESI moved pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) to dismiss the complaint as against it for failure to state a claim upon which relief can be granted.

On October 3, 2014, the Court, upon review of the proposed and modified TROs submitted by the parties, (1) vacated the September 11, 2014 TRO and (2) ordered that, pending further order of this Court, the Defendants were stayed and enjoined from (a) denying prescription drug benefit coverage to the Individual Plaintiffs for compounded medications prescribed to them on or after September 11, 2014, or for the refill of an existing refillable prescription after September 11, 2014, by their licensed physicians, which had heretofore been covered by their insurance; (b) from refusing to process and/or pay claims submitted by HMC

for the payment of prescriptions dated on or after September 11, 2014, or for the refill of an existing refillable prescription after September 11, 2014, for compounded medications prescribed by licensed physicians for their patients, which had heretofore been covered by their insurance; (c) from retaliating in any way against any licensed physician who writes a prescription for a compounded medication and/or provides materials or information required by a defendant for prior approval of compounded medications for a patient; (d) from prohibiting HMC from using the United States Postal Service or other delivery service to deliver to patients the compounded medications prescribed by their licensed physicians.

The Court also directed that, within five days of the date of the order, the Plaintiffs must post a bond in the sum of One Hundred Thousand ($100,000.00) Dollars to be deposited with the Court in an interest bearing account as a condition of the October 3, 2014 TRO.  Finally, the Court directed that the October 3, 2014 TRO remain in full force and effect until a hearing on the preliminary injunction.

Also, on October 3, 2014, HMC filed a letter motion requesting that the Court issue an order holding in abeyance ESI's and Prime's motions to dismiss pending a decision on the motions to sever/arbitrate/transfer.

On October 8, 2014, the Court granted HMC's motion for a stay to the extent it indicated that HMC would have until 14 days after the Court rendered a decision on the respective motions to sever/ arbitrate/transfer to respond to the motions to dismiss brought by ESI and Prime.

On October 10, 2014, Caremark moved to strike in its entirety the declaration of Stanley A. Camhi, Esq., submitted in support of HMC's opposition to Caremark's motion to sever HMC's claims against it and to compel arbitration of those claims.  According to Caremark, Camhi's declaration is (1) non-compliant with 28 U.S.C. § 1746 as it was not expressly made

"under penalty of perjury"; (2) is not based upon personal knowledge; and (3) contains legal arguments.

On October 14, 2014, HMC submitted a supplemental declaration from Camhi made "under penalty of perjury." As this supplemental declaration was submitted after the date agreed upon by HMC and Caremark for HMC to submit its opposition papers (see Doc No. 57), the Court construes this submission as a motion for leave to file a supplemental declaration in support of its opposition papers and the Court, in its discretion, grants that request, thereby mooting in part Caremark's motion to strike. As to the other bases for the motion to strike, the Court will disregard any statements not based upon personal knowledge or those that contain legal arguments, rather than strike the declaration in its entirety. For the foregoing reasons, the Court denies Caremark's motion to strike Camhi's declaration in its entirety.

Also, October 14, 2014, HMC, dissatisfied with what it perceived as the Defendants' non-compliance with the October 3, 2014 TRO, moved by letter motion for a hearing to clarify the scope of that order or for the Court to set a schedule for a contemplated formal contempt motion. Caremark, Optum, and ESI filed letters in opposition to this request, disputing HMC's interpretation of the October 3, 2014 TRO.

As explained later, at this juncture, the Court declines to revisit or interpret the terms of the October 3, 2014 TRO. HMC can address its concerns to the appropriate arbitrators or, with respect to ESI, the federal district court in Missouri. The October 14, 2014 letter motion is, thus, denied without prejudice.

## II.    DISCUSSION

A.  <u>As to the Respective Motions to Sever and Arbitrate</u>

The FAA embodies a "federal policy favoring arbitration." <u>Granite Rock Co. v. Int'l Bhd. of Teamsters</u>, 561 U.S. 287, 302, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010)(citation and quotation  marks omitted) .  Thus, courts apply a "presumption of arbitrability," but only if an "enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand." <u>Id.</u> at 301, 130 S. Ct. 2847.  "In other words, while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." <u>Applied Energetics, Inc. v. NewOak Capital Mkts., LLC</u>, 645 F.3d 522, 526 (2d Cir. 2011).

With these standards in mind, the Court addresses the motions to sever/arbitrate/transfer.

1.  <u>The Caremark Motion to Sever and Arbitrate</u>

As noted above, the relationship between Caremark and HMC is governed by the Caremark Provider Agreement.   That agreement was entered into between HMC and Caremark's subsidiaries, CaremarkPCS, L.L.C. and Caremark, L.L.C., the entities that perform the prescription benefit management services discussed in the complaint.

Of relevance here, paragraph 11 of the Caremark Provider Agreement provides: "The [Provider] Agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between [HMC] and [Caremark], all of which are incorporated by this reference as if fully set forth herein" (Doc No. 34, Exh. A, at ¶ 11.)  The "Provider Manual" is distributed to all pharmacy providers in Caremark's networks.  The Provider Manual has been revised from time to time, and each new version is sent to HMC.

In addition, the Provider Manual contained a provision authorizing Caremark to

unilaterally amend the Caremark Provider Agreement and Provider Manual:

Amendments

From time to time, and notwithstanding any other provision in the Provider
Agreement (which includes the Provider Manual), Caremark may amend the
Provider Agreement, including the Provider Manual or other Caremark
Documents, by giving notice to Provider of the terms of the amendment and
specifying the date the amendment becomes effective. If Provider submits claims
to Caremark after the effective date of any notice or amendment, the terms of the
notice or amendment is accepted by Provider and is considered part of Provider
Agreement.

(Id., Exh B.)

Caremark sent the 2014 version of the Provider Manual to HMC and it was signed for by

HMC in November 2013. Like its predecessors, the 2014 Provider Manual includes an

arbitration provision, which provides:

Arbitration

Any and all disputes between Provider and Caremark (including Caremark's
employees, parents, subsidiaries, affiliates, agents and assigns (collectively
referred to in this Arbitration section as "Caremark"), including but not limited to
disputes in connection with, arising out of, or relating in any way to, the Provider
Agreement or to Provider's participation in one or more Caremark networks or
exclusion from any Caremark networks, will be exclusively settled by arbitration.
Unless otherwise agreed to in writing by the parties, the arbitration shall be
administered by the American Arbitration Association ("AAA") pursuant to the
then applicable AAA Commercial Arbitration Rules and Mediation Procedures
(available from the AAA). . . . The arbitrator(s) shall have exclusive authority to
resolve any dispute relating to the interpretation, applicability, enforceability or
formation of the agreement to arbitrate, including, but not limited to any claim
that all or part of the agreement to arbitrate is void or voidable for any reason.
The arbitrator(s) must follow the rule of Law, and the award of the arbitrator(s)
will be final and binding on the parties, and judgment upon such award may be
entered in any court having jurisdiction thereof. Any such arbitration must be
conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless
otherwise agreed to by the parties in writing. The expenses of arbitration, including
reasonable attorney's fees, will be paid for by the party against whom the award of the
arbitrator(s) is rendered, except as otherwise required by law.

Arbitration with respect to a dispute is binding and neither Provider nor Caremark will have the right to litigate that dispute through a court. In arbitration, Provider and Caremark will not have the rights that are provided in court, including the right to a trial by judge or jury. In addition, the right to discovery and the right to appeal are limited or eliminated by arbitration. All of these rights are waived and disputes must be resolved through arbitration.

No dispute between Provider and Caremark may be pursued or resolved as part of a class action . . .

The above notwithstanding, nothing in this provision shall prevent either party from seeking preliminary injunctive relief to halt or prevent a breach of this Provider Agreement in any state or federal court of law.

. . .

The terms of this arbitration section apply notwithstanding any other or contrary provision in the Provider Agreement, including, but not limited to, any contrary language in any Third Party Beneficiary provision. This Arbitration section survives the termination of this Provider Agreement and the completion of the business relationship between Provider and Caremark. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

(Id., Exh. B)  The Caremark Provider agreement, including the Provider Manual, is "[u]nless otherwise mandated by applicable Law . . . [to] be construed, governed, and enforced in accordance with the laws of the State of Arizona without regard to choice of law provisions."

(Id., Ex. A., ¶ 13)

As noted above, Caremark has terminated the Caremark Provider Agreement. HMC now brings this litigation against Caremark, and other PBMs, raising a number of claims, not including breach of contract of the Caremark Provider Agreement or Provider Manual. Caremark has moved to sever HMC's claims against it and to arbitrate those claims. HMC seeks to avoid enforcement of the above-cited arbitration provisions on a number of grounds.

a. Public Policy

HMC first argues that public policy considerations militate against arbitration of its New York State antitrust claims. In this regard, however, HMC's reliance on Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 82 S. Ct. 1404, 8 L. Ed. 2d 777 (1962) and Jung v. Association of American Medical Colleges, 300 F. Supp. 2d 119 (D.D.C. 2004), in support of its argument that arbitration would prevent them from effectively vindicating their rights under the Donnelly Act, is misplaced.

First, those cases involved the Sherman Act, 15 U.S.C. § 1, *et seq.*, a federal antitrust statute. Second, nothing in Continental Ore or Jung dictates that federal antitrust claims based on a conspiracy may not be arbitrated. In Continental Ore, the Court made clear only that when considering the conduct of any one defendant, the fact-finder must be able to consider not only the actions of that one defendant, but those of the entire conspiracy, looking at "the whole picture and not merely at the individual figures in it." 370 U.S. at 699, 82 S. Ct. 1404 (internal quotation marks omitted). Similarly, Jung merely stands for the proposition that a defendant may not compel arbitration of only one part of a larger conspiracy claim.

To be sure, "New York courts have forbidden arbitration of suits involving . . . enforcement of state antitrust laws." U.S. ex rel. Mikes v. Straus, 897 F. Supp. 805, 808 (S.D.N.Y. 1995)(citing Matter of Aimcee Wholesale Corp. v. Tomar Prods., Inc., 21 N.Y.2d 621, 289 N.Y.S.2d 968, 237 N.E.2d 223 (1968)).

In Aimcee, the New York Court of Appeals highlighted the "public policy of the first magnitude" represented by New York's antitrust law, the penal sanctions included in the law, the public role accorded the attorney general to investigate and prosecute antitrust violations, and the fact that arbitrators are neither bound by rules of law nor obliged to give reasons for their rulings.

That Court determined that the "courts cannot abdicate their control over antitrust policy" by allowing such matters to be resolved by privately appointed arbitrators via broad arbitration agreements. 289 N.Y.S.2d at 973, 237 N.E.2d at 227. Said that Court: "[I]t must be recognized that through the use of economic power and contracts of adhesion, containing broad arbitration clauses, antitrust violators may be able to insulate their transgressions of antitrust law from judicial scrutiny. The opportunity for abuse is apparent. Under various guises, an industry, while nominally assuring obedience to the State's antitrust law, may in reality be establishing and enforcing entirely unacceptable practices." 289 N.Y.S.2d at 973-74, 237 N.E.2d at 227.

Here, however, the Court finds that the FAA policy favoring arbitration of disputes displaces the public policy in New York favoring a judicial forum for resolution of New York State antitrust claims. AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1743, 179 L. Ed. 2d (2011)("When state law prohibits outright the arbitration of a particular type of claim, the FAA displaces the conflicting rule"); Southland Corp. v. Keating, 465 U.S. 1, 10, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984)("Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."); Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)(the FAA reflects "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.")(emphasis added). Therefore, based on this case law, the Court declines to hold that public policy militates against arbitration of HMC's Donnelly Act claims against Caremark.

b. <u>Scope</u>

HMC also argues that, even if public policy does not militate against arbitration of its state antitrust claims against Caremark, these and its other claims fall outside the scope of the arbitration provision incorporated in the Caremark Provider Agreement.  HMC highlights the fact that it does not bring any breach of contract claims, but, instead, seeks redress for damages it has allegedly sustained as a result of the "concerted and joint effort of [Caremark] and the other defendants to eliminate the market for compounded medications through anticompetitive activities and the deception of consumers." (Doc No. 76, at 21.)

Ordinarily, whether a claim is subject to arbitration is a question for a court.  However, if the parties have "clearly and unmistakably" agreed to arbitrate "arbitrability," certain threshold questions — such as whether a particular claim is subject to arbitration — are for the arbitrator, and not a court, to decide. Rent–A–Center, West, Inc., v. Jackson, 130 S. Ct. 2772, 2778 n. 1, 561 U.S. 63 (2010).

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995).  This is because arbitration itself "is a matter of contract." Rent–A–Center, 130 S. Ct. at 2776.

Courts applying Arizona law have determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes "clear and unmistakable" evidence that the parties agreed to arbitrate "arbitrability." Brake Masters Systems, Inc. v. Gabbay, 206 Ariz. 360, 78 P.3d 1081 (App. 2003)(enforcing parties' agreement that arbitrator would determine whether claims were arbitrable).  The Court also notes that "[v]irtually every circuit to

have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." Oracle Am., Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1074 (9th Cir. 2013); see Petrofac, Inc. v. DynMcDermott Petroleum Operations Co., 687 F.3d 671, 675 (5th Cir. 2012); Fallo v. High–Tech Inst., 559 F.3d 874, 878 (8th Cir. 2009); Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1373 (Fed. Cir. 2006); Terminix Int'l Co. v. Palmer Ranch LP, 432 F.3d 1327, 1332 (11th Cir. 2005); Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005).

In accordance with this case law, the Court finds that, by incorporating the AAA rules into the arbitration provision, HMC and Caremark agreed that the arbitrator, rather than the court, would determine the "arbitrability" of a dispute – that is, because the AAA Rules provide: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." See AAA Commercial Arbitration Rule R-7(a), available at http://www.adr.org/aaa/faces/rules. For this reason, the Court does not address HMC's argument that its claims against Caremark do not arise out or are not in connection with the Caremark Provider Agreement.

c.  Unconscionability

HMC also argues that the Caremark Provider Agreement itself is a contract of adhesion, while the arbitration clause contained therein is procedurally and/or substantively unconscionable.  Caremark correctly asserts that the issue of whether the Caremark Provider Agreement — as opposed to the arbitration clause alone — is a contract of adhesion is an "arbitrable" matter not properly considered by a court. Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967)("[I]f the

claim is fraud in the inducement of the arbitration clause itself — an issue which goes to the 'making' of the agreement to arbitrate — the federal court may proceed to adjudicate it. But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally."); <u>see also</u> <u>JLM Indus., Inc. v. Stolt-Nielsen SA</u>, 387 F.3d 163, 170 (2d Cir. 2004)(summarizing <u>Prima Paint</u>); <u>Wright v. SFX Entm't Inc.</u>, No. 00 CIV 5354 (SAS), 2001 WL 103433, at *3 (S.D.N.Y. Feb. 7, 2001)("Claims of unconscionability and adhesion contracts are similarly included within the <u>Prima Paint</u> rule.") This, of course, assumes that the arbitration provision is otherwise conscionable and enforceable.

As an initial matter, the Court first considers which jurisdiction's law of unconsionability applies. A federal court exercising diversity jurisdiction generally must apply the choice-of-law rules of the state in which the court sits. <u>Liberty Synergistics Inc. v. Microflo Ltd.</u>, 718 F.3d 138, 153 (2d Cir. 2013)("a federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which that court sits to determine the rules of decision that would apply if the suit were brought in state court."). However, where, as here, in the event that the parties are bound by a contract containing a choice-of-law provision, that provision "will be enforced absent a violation of New York public policy." <u>Cap Gemini Ernst & Young U.S. LLC v. Nackel</u>, 02 CVI 6872 (DLC), 2004 WL 569554, at *5 (S.D.N.Y. Mar. 23, 2004).

The Provider Agreement here contains a choice-of-law provision which provides for the application of Arizona law, and both parties cite Arizona case law.

Under Arizona law, "[a]n unconscionable contract is unenforceable." <u>Clark v. Renaissance W., LLC</u>, 232 Ariz. 510, 307 P.3d 77, 79 (Ariz. Ct. App. 2013). Arizona law recognizes two types of unconscionability: procedural and substantive. <u>Id.</u> "Procedural unconscionability addresses the fairness of the bargaining process, which 'is concerned with

"unfair surprise," fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should.'" Id. (quoting Maxwell v. Fidelity Fin. Servs., Inc., 184 Ariz. 82, 907 P.2d 51, 57–58 (1995)). "In contrast, substantive unconscionability addresses the fairness of the terms of the contract itself. A contract may be substantively unconscionable when the terms of the contract are so one-sided as to be overly oppressive or unduly harsh to one of the parties." Id. (citation omitted).

In addition, "[a] finding of either substantive unconscionability or procedural unconscionability is sufficient to make an arbitration clause unenforceable." R & L Ltd. Invs., Inc. v. Cabot Inv. Props., LLC, 729 F. Supp. 2d 1110, 1114 (D. Ariz. 2010)(emphasis added).

Importantly, the Plaintiff bears the burden of proving an unconscionability-related defense to arbitration, see Heinig v. Hudman, 177 Ariz. 66, 865 P.2d 110, 117–18 (Ariz. Ct. App. 1994), which, with respect to invalidating an arbitration clause, is "a high bar to meet," Coup v. Scottsdale Plaza Resort, LLC, 823 F. Supp. 2d 931, 947 (D. Ariz. 2011)(internal quotation marks omitted).

Here, HMC argues that the arbitration provision, assuming it applies to the instant claims, is procedurally unconscionable because (1) it defies HMC's "reasonable expectations" and (2) can be amended unilaterally by Caremark.

With respect to whether the arbitration provision incorporated in the Caremark Provider Agreement was within HMC's "reasonable expectations," Arizona law provides that a contract term is beyond the range of reasonable expectation if one party to the contract has reason to believe that the other party would not have accepted the agreement if that party had known that the agreement contained the particular term at issue. Harrington v. Pulte Home Corporation, 211 Ariz. 241, 247, 119 P.3d 1044, 1050 (Ct. App. 2005)(holding that the reasonable expectation

doctrine did not prohibit the enforceability of an arbitration clause in a contract of adhesion).

This "reason to believe" may be (1) shown by prior negotiations, (2) inferred from the

circumstances, (3) inferred from the fact that the provision at issue is bizarre or oppressive, (4)

shown by the fact that the provision at issue eviscerates the agreed-to non-standard terms, (5)

proved if the provision eliminates the dominant purpose of the transaction, (6) shown if the

provision cannot be understood if the party challenging it attempts to check on his rights, and (7)

shown by any other facts relevant to what the challenging party reasonably expected from the

contract. Id. at 1050–51.

Here, the Court finds that HMC has not made the required showing on any of the

Harrington factors.  Rather, HMC focuses on the fact that Provider Manual, which contained the

subject arbitration provision, was not sent to HMC until eight months after the execution of the

Provider Agreement.   Rather, a different provider agreement, with a different arbitration

provision, was in effect at the time the Provider Argument was executed.  In addition, the cover

letter which purportedly accompanied the "revised" Provider Manual does not explain the

arbitration provision or call attention to the fact that it was amended.  Finally, HMC contends

that the provision is "is not actually contained in the Provider Agreement, but is buried within

the two hundred pages of the Provider Manual" (Doc No. 76, at 12.)

However, "the arbitration clause was no less conspicuous than any other provision of the

Provider Manual and thus, as required by Arizona law, neither illegible nor hidden from view.

Moreover, Arizona case law expressly disclaims any duty on the part of the Defendants to draw

the Plaintiffs' attention to all that they were agreeing to.  [HMC]'s failure to familiarize [itself]

with what [it] signed does not render the Provider Manual's arbitration clause unconscionable or

unenforceable." Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp., 748 F.3d 249, 265 (5th

Cir. 2014); see Rocz v. Drexel Burnham Lambert, Inc., 154 Ariz. 462, 743 P.2d 971, 975 (Ariz. Ct. App. 1987)("Parties cannot repudiate their written contracts by asserting that they neglected to read them or did not really mean them."); see also Coup, 823 F. Supp. 2d at 949 ("Plaintiffs' admitted failure to read the employee manual . . . do[es] not render [the] arbitration policy and clause procedurally unconscionable.")(citing Rocz, 743 P.2d at 975)).

As noted above, HMC also argues that the arbitration clause is procedurally unconscionable because Caremark reserved the right to unilaterally modify any provision of the Caremark Provider Agreement, including the incorporated arbitration provision. This argument is unpersuasive.

"[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." Rent-A-Ctr., W., Inc., 561 U.S. at 70, 130 S. Ct. 2772, 2778, 177 L. Ed. 2d 403. In other words, a provision permitting the unilateral amendment of any term of contract does not, without more, render a separate provision, such as an arbitration provision, unenforceable on procedural grounds.

The Court takes note of Uptown Drug Co. v. CVS Caremark Corp., 962 F. Supp. 2d 1172 (N.D. Cal. 2013). There, the plaintiff, which provided pharmacy services to individuals who participated in certain group health plans, brought a putative class action against competing retail pharmacy chain with which it had a business relationship pursuant to which its customers received drug benefits under pharmacy benefit manager prescription plans. The plaintiff alleged violations of California Uniform Trade Secrets Act, violations of California Unfair Competition Law, violations of unfair prong of Unfair Competition Law, and interference with prospective economic advantage. The defendant retail pharmacy chain moved to compel arbitration and to stay the action pending arbitration.

Applying California law but noting that "the test for unconscionability is the same under either California or Arizona law," id. at 1180 n. 9, the court rejected the argument that an arbitration provision was unconscionable because Caremark reserved the right to unilaterally modify the clause, reasoning:

> Caremark complied with its contractual obligation to give advance notice to Uptown each time it amended the Caremark Provider Agreement. The purpose of the advance-notice requirement presumably was to give provider pharmacies an opportunity to exit their contractual relationship with Caremark if they objected to the proposed amendments. Also, Uptown has submitted no evidence to show that it could not have negotiated to alter the terms of the proposed amendments, or that it could not have terminated its business relationship with Caremark and established a relationship with an alternative partner in the event that Caremark refused to negotiate.

Id. at 1181-82 (internal citations omitted). The reasoning of Uptown applies with full force to the relationship between HMC and Caremark, two sophisticated corporate entities.

Accordingly, the Court finds that HMC has failed to establish that the arbitration provision incorporated in the Caremark Provider Agreement is procedurally unconscionable under Arizona law.

Turning to substantive unconscionability, the Court notes that, under Arizona law, this doctrine "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." Maxwell v. Fid. Fin. Servs., Inc., 184 Ariz. 82, 89, 907 P.2d 51, 58 (1995); see also Harrington v. Pulte Home Corp., 211 Ariz. 241, 119 P.3d 1044, 1055 (Ariz. Ct. App. 2005)(factors showing substantive unconscionability include "contractual terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity"). "In Arizona, a case-by-case approach is used in determining whether the terms imposed under an arbitration agreement denies a potential litigant the opportunity to vindicate her rights." Wernett v. Service Phoenix,

LLC, No. CIV 09–168(TUC)(CKJ), 2009 WL 1955612, at *5 (D. Ariz. 2009)(citing Batory v. Sears, Roebuck & Co., 456 F. Supp. 2d 1137, 1141 (D. Ariz. 2006)).

In this case, HMC argues that the arbitration provision's limitations on discovery prevent it from effectively vindicating its rights, thereby rendering that provision substantively unconscionable. The Court agrees.

Of relevance here, the arbitration provision states that "the right to discovery and the right to appeal are limited or eliminated by arbitration. All of these rights are waived and disputes must be resolved through arbitration." (Doc No. 34, Exh. B.)(emphasis omitted). The Court cannot conceive of a more restrictive limitation.

Wernett is instructive. There, the relevant arbitration agreement provided, as to discovery, as follows:

> . . . The parties may request subpoenas for documents at the pre-arbitration conference from any other party or witness and the documents must be produced within 10 days of the pre-arbitration conference with copies provided to all parties. The parties may request at the pre-arbitration conference subpoenas to take a maximum of 2 depositions prior to the arbitration hearing. No additional witnesses other than the witnesses disclosed at the pre-arbitration conference or documents may be introduced at the Arbitration, exception for rebuttal purposes only.

Wernett, 2009 WL 1955612, at *6. The court, applying Arizona law, declined to find this discovery term substantively unconscionable in part on the basis that while discovery was "limited," it was not "precluded." Id. at *7.

Here, by contrast, the relevant language "eliminate[s]" discovery, while making clear that any rights to discovery are "waived." As Caremark notes, the fact that an arbitrator retains authority to permit discovery pursuant to the AAA Commercial Rules is of little, if any, moment because nothing requires him or her to exercise that authority, even to the slightest degree. For this reason, the Court finds this term

substantively unconscionable.

To be clear, the Court is not crediting HMC's argument that the discovery provision is substantively unconscionable on the basis that "Caremark is the party likely to be in control of the documents and witnesses that are relevant to HMC's antitrust and deceptive practice claims, the discovery limitations are not nearly as unfair to it as they are to HMC." (Doc No. 76, at 16.)  On this contention, however, it is not clear under Arizona law that, assuming an arbitration provision applies to a cause of action, the substantive unconscionability of a term of that provision turns on the type of cause of action brought in a lawsuit between the contracting parties.

The Court next addresses whether any part of the limitation on damages contained in the arbitration provision is substantively unconscionable under Arizona law.

That provision states: "In no event may the arbitrator(s) award indirect, consequential or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business, except as required by law." (Doc No. 34, Exh. B.)  This ambiguous clause, while broad, does not, in the Court's view, rise to the level of substantive unconscionability.

Initially, the Court pauses to note that its review is limited to whether the arbitration clause itself is unconscionable, and therefore, unenforceable.  Whether and how this limitation on remedies would apply to HMC's claims against Caremark, which do not purport to be based on the contract, is a question for the arbitrator, rather than the Court, to resolve. PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 407, 123 S. Ct. 1531, 1536, 155 L. Ed. 2d 578 (2003)(submitting issue of enforceability of limit on

punitive damages to arbitrator because it was unclear whether that limit conflicted with RICO treble damages)

To clarify, as explained later, were the arbitrator to find that HMC's claims against Caremark were "arbitrable" – that is, that they are brought "in connection with [or] arise[] out of the" the Caremark Provider Agreement (Doc No. 34, Exh. B.); render a decision on the merits; and reach the question of remedies, the arbitrator would be compelled to interpret the limiting phrase "except as required by law" in the remedies clause. (Id.).  Given this ambiguity, and "since [the Court] do[es] not know how the arbitrator will construe the remedial limitations, the questions whether they render the parties' agreements unenforceable and whether it is for courts or arbitrators to decide enforceability in the first instance are unusually abstract." PacifiCare, 538 U.S. at 407, 123 S. Ct. 1531, 1536, 155 L. Ed. 2d 578.  Under these circumstances, the "proper course is to compel arbitration." Id.

However, the Court will wade into the interpretation of the arbitration provision to the extent it distinguishes two Arizona cases, namely Wernett and Batory v. Sears, Roebuck & Co., 456 F. Supp. 2d 1137, 1141 (D. Ariz. 2006), finding certain terms of an arbitration provision to be substantively unconscionable.  Those cases involved employment contracts between an individual-employee and employer.  Here, by contrast, the Court is presented with a sophisticated corporate entity, HMC.

Moreover, even if the Court were to find some or all of the limitations on remedies to be substantively unconscionable, the Court would, as explained later, sever the unconscionable terms and refer those claims to arbitration on the remaining terms pursuant to the severability clause of the Caremark Provider Agreement.

Finally, the Court addresses HMC's argument that the cost of arbitrating its extra-contractual claims against the various Defendants renders the agreement to arbitrate substantively unconscionable. This argument is unpersuasive.

"An arbitration agreement may be substantively unconscionable if the fees and costs to arbitrate are so excessive as to 'deny a potential litigant the opportunity to vindicate his or her rights.'" Clark, 307 P.3d at 79 (quoting Harrington, 119 P.3d at 1055); see also Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 90, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)("It may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum."). However, the mere "risk that [a litigant] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." Randolph, 531 U.S. at 91, 121 S. Ct. 513. Thus, "[t]he party seeking to invalidate an arbitration agreement on [the] grounds [of excessive fees or costs] has the burden of proving that arbitration would be prohibitively expensive." Clark, 307 P.3d at 80. Under Arizona law, such a showing requires the court to consider several factors:

> First, the party seeking to invalidate the arbitration agreement must present evidence concerning the cost to arbitrate. This evidence cannot be speculative; it must be based on specific facts showing with reasonable certainty the likely costs of arbitration.

> Second, a party must make a specific, individualized showing as to why he or she would be financially unable to bear the costs of arbitration. This evidence must consist of more than conclusory allegations stating a person is unable to pay the costs of arbitration. Rather, parties must show that based on their specific income/assets, they are unable to pay the likely costs of arbitration.

> Third, a court must consider whether the arbitration agreement or the applicable arbitration rules referenced in the arbitration agreement permit a party to waive or reduce the costs of arbitration based on financial hardship.

Id. (citations omitted).

In this case, while HMC provides the approximate percentage of HMC's revenue derived from each Defendant, it offers no evidence of its total income or assets, nor how much of its gross or net revenue it receives annually. In fact, HMC has "failed to present any specific, individualized evidence that they were likely to face prohibitive costs if forced to arbitrate their underlying claims." Crawford, 748 F.3d at 267. The Court also notes that the arbitration provision provides that "[t]he expenses of arbitration, including reasonable attorney's fees, will be paid for by the party against whom the award of the arbitrator(s) is rendered, except as otherwise required by law. (Doc No. 34, Exh. B).

It is true that HMC avers that it may cost over $1 million to prosecute its claims in arbitration against each defendant. However, first, it is not clear whether the proper inquiry, in considering costs to arbitrate under a contractual provision, should include the cost of having to litigate or arbitrate against a third party not bound by the subject arbitration clause, even if the underlying claims sound in antitrust. See Am. Exp. Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2309, 186 L. Ed. 2d 417 (2013)("antitrust laws do not guarantee an affordable procedural path to the vindication of every claim."). Stated otherwise, it is not clear that the potential costs of arbitration against Caremark, excluding the costs of litigating or arbitrating the other defendants, would be cost prohibitive to HMC. To hold otherwise would allow parties to avoid arbitration agreements by styling their claims in antitrust and against multiple defendants.

Second, the Court notes that HMC seeks approximately $14 million in damages (Camhi Decl., at ¶ 13.), the recovery of which would dwarf any costs associated with arbitration. Accordingly, the Court concludes that the potential costs of arbitration do not render the arbitration clause incorporated in the Caremark Provider Agreement substantively unconscionable under Arizona law.

Although the Court has found to be with merit HMC argument that the arbitration clause's limitation on discovery is substantively unconscionable, it does not follow that HMC can avoid arbitration as against Caremark. The Caremark Provider Manual, incorporated in the Caremark Provider Agreement, contains a severability clause, entitled "Enforceability," which provides that: "In the event that any provision or term set forth in the Provider Agreement is determined to be invalid or unenforceable, such invalidity and unenforceability will not affect the validity or enforceability of any other provision or term set forth in the Provider Agreement." (Doc No. 34, Exh. B.)

Further, Arizona's statutory provision on unconscionability provides, in pertinent part:

A. If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

A.R.S. § 47–2302. However, the Court "cannot create a new agreement for the parties to uphold the contract." <u>Olliver/Pilcher Insur. Inc. v. Daniels</u>, 148 Ariz. 530, 715 P.2d 1218, 1221 (1986)(citations omitted); <u>see also</u> <u>Fearnow v. Ridenour Swenson, Cleere & Evans</u>, P. C., 213 Ariz. 24, 32, 138 P.3d 723, 731 (2006)(where contracts contain restrictive covenants, but not containing a severability clause, Arizona courts eliminate "grammatically severable, unreasonable provisions").

In the Court's view, the arbitration agreement incorporated in the Caremark Provider agreement does not contain an "insidious pattern" that provides one party with "undue advantages." <u>Wernett</u>, 2009 WL 1955612, at *9. Furthermore, severance of the substantively unconscionable terms will permit an arbitrator to determine appropriate discovery procedures. <u>See</u> <u>id.</u> Therefore, while the unconscionable terms regarding discovery will be severed, HMC

and Caremark are directed to participate in arbitration pursuant to the remaining terms of the arbitration agreement.

As a final matter, the Court renders no determination on whether HMC violated that part of the arbitration provision prohibiting class actions.

2. <u>The Optum Motion to Sever and Arbitrate</u>

As noted above, the relationship between Optum and HMC is governed by the Optum Provider Agreement. Of relevance here, Section 10.3 of the Optum Provider Agreement states that all "Disputes" "shall . . . be submitted to binding arbitration before a panel of three arbitrators in accordance with the Commercial Dispute Procedures of the American Arbitration Association, as they may be amended from time to time" and that such arbitration shall take place in either Los Angeles County or Orange County, California. (Doc No. 39, Exh A., at ¶ 10.3-.4) "Disputes" are broadly defined as "any and all issues and/or disputes between" the parties "including, but not limited to all questions of arbitrability, the existence, validity, scope, interpretation, or termination of the [Optum Provider] Agreement . . . ." <u>Id.</u> § 10.1. The arbitration provision also states that the panel of arbitrators "shall not vary or ignore the terms of [the Agreement]" and that where "any inconsistency exists between the rules of the applicable arbitral forum and the arbitration provisions contained herein . . . the arbitration provisions contained herein will control and supersede such rules." <u>Id.</u> at ¶ 10.5.

In addition, the arbitration provision "limit[s]" fact discovery to an exchange of "statements setting forth the fact(s) supporting the claim(s) and all defenses to be raised at the arbitration, and a list of exhibits and witnesses" unless a party requests an oral hearing, in which case the parties must also exchange a summary of the testimony of each witness expected to testify and copies of the documents to be introduced at the hearing. <u>Id.</u> at ¶ 10.7. With respect to

damages, the arbitration provision provides that the arbitrator "will have no authority to award punitive, exemplary, indirect, special damages or any other damages not measured by the prevailing party's actual damages, and may not make any . . . award that does not conform to the terms and conditions of the [Optum Provider] Agreement." <u>Id.</u> at ¶ 10.8.

As previously mentioned, Optum has terminated the Optum Provider Agreement. HMC now brings this litigation against Optum, and other PBMs, raising a number of claims, not including breach of contract of the Optum Provider Agreement. Optum has moved to sever HMC's claims against it and to arbitrate those claims. HMC seeks to avoid enforcement of the above-cited arbitration provisions on a number of grounds.

### a. Public Policy

HMC advances the same public policy arguments against arbitration of its New York State antitrust claims against Optum that it did unsuccessfully against Caremark. For the reasons explained above, the Court declines to hold that public policy militates against arbitration of HMC's Donnelly Act claims against Optum.

### b. Scope

HMC also argues that its claims against Optum fall outside the scope of the arbitration provision contained in the Optum Provider Agreement and are, therefore, not "arbitrable."

However, as noted above, the Supreme Court has recognized that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." <u>Rent–A–Center</u>, 130 S. Ct. at 2777. "While arbitrability is ordinarily decided by the court, both state and federal cases hold that this issue may be referred to an arbitrator if there is 'clear and unmistakable' evidence that the parties intended that the question of arbitrability be decided by an arbitrator." <u>Bernal v. Sw.</u>

& Pac. Specialty Fin., Inc., C 12-05797 (SBA), 2014 WL 1868787, at *2 (N.D. Cal. May 7, 2014)(citation omitted); see also Poweragent, Inc. v. Electronic Data Sys. Corp., 358 F.3d 1187, 1191 (9th Cir. 2004); Dream Theater Inc. v. Dream Theater, 124 Cal. App. 4th 547, 550–557 (2004).

California courts often look to federal law in deciding arbitration issues and "California law is consistent with federal law on the question of who decides disputes over arbitrability." Dream Theater, 124 Cal. App. 4th at 553.

To make the determination whether "arbitrability" is decided by the court or arbitrator, courts applying California law conduct a "facial and limited" review of the contract in order to decide whether the parties "have in fact clearly and unmistakably agreed to commit the question of arbitrability to [an] arbitrator." Anderson v. Pitney Bowes, Inc., No. C 04-4808 (SBA), 2005 WL 1048700, at *4 (N.D. Cal. 2005). "The language of an arbitration agreement establishes whether the determination of arbitrability is for the court or delegated to an arbitrator." Fadal Machining Ctrs., LLC v. Compumachine, Inc., 461 Fed. Appx., 630, 632 (9th Cir. 2011)(citing First Options, 514 U.S. at 943). When the parties empower the arbitrator to decide "arbitrability," the Court's role is narrowed from deciding whether there is an applicable arbitration agreement to only deciding whether there is a valid delegation clause. See Rent–A–Center, 130 S. Ct. at 2779.

"[W]here the parties' agreement to arbitrate includes an agreement to follow a particular set of arbitration rules — such as the AAA Rules — that provide for the arbitrator to decide questions of arbitrability, the presumption that courts decide arbitrability falls away, and the issue is decided by the arbitrator." Bank of America, N.A. v. Micheletti Family Partnership, No. 08-02902 (JSW), 2008 WL 4571245, at *6 (N.D. Cal. 2008); Anderson, 2005 WL 1048700, at

*2–4; Dream Theater, 124 Cal. App. 4th at 557.  If the court finds that the parties to the agreement did "clearly and unmistakably" intend to delegate the power to decide arbitrability to an arbitrator, then the court should perform a second, more limited inquiry to determine whether the assertion of arbitrability is "wholly groundless." Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1371 (Fed. Cir. 2006)(applying California law)(citing Dream Theater, 124 Cal. App. 4th at 553).

If the court finds that the assertion of arbitrability is not "wholly groundless," then it should stay the trial of the action pending a ruling on "arbitrability" by an arbitrator. Qualcomm, 466 F.3d at 1371.  If the district court finds that the assertion of arbitrability is 'wholly groundless,' then it may conclude that it is not 'satisfied' under section 3 of the FAA, and deny the moving party's request for a stay. Id.

Here, Section 10.3 of the Optum Provider Agreement provides, in pertinent part, that that "Disputes" "shall . . . be submitted to binding arbitration . . . in accordance with the Commercial Dispute Procedures of the American Arbitration Association, as they may be amended from time to time . . . ."  (Doc No. 39, Exh A., § 10.3)  The applicable AAA Rules state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or the arbitrability of any claim or counterclaim."  See AAA Commercial Arbitration Rule R-7, available at http://www.adr.org/aaa/faces/rules.  The Optum Provider Agreement broadly defines "Disputes" to include "all questions of arbitrability."

Thus, the arbitration agreement evinces a clear intent to delegate the issue of "arbitrability" to an arbitrator.  "Indeed, when an arbitration agreement explicitly incorporates the AAA Rules, numerous courts have held that the parties clearly and unmistakably agreed that

the issue of arbitrability would be submitted to arbitration for resolution." <u>Bernal</u>, 2014 WL 1868787, at *4; <u>see e.g.</u>, <u>Clarium Capital Management LLC v. Choudhury</u>, Nos. C 08-5157 (SBA), 06-5255. 2009 WL 331588, at *5 (N.D. Cal. 2009)("The incorporation of the AAA rules in the arbitration agreement is 'clear and unmistakable' evidence of the parties' intent to delegate the issue of arbitrability to the arbitrator."); <u>see also</u> <u>Fadal Machining Centers, LLC v. Compumachine, Inc.</u>, 461 F. App'x 630, 632 (9th Cir. 2011)(applying California law and holding that the trial court did not err in concluding that the incorporation of the AAA's Commercial Arbitration Rules was a clear and unmistakable delegation of the issue of arbitrability to the arbitrator); <u>Qualcomm</u>, 466 F.3d at 1373 (by agreeing to arbitrate under AAA rules, the parties evidenced their unmistakable intent to delegate the issue of determining arbitrability to an arbitrator).

For its part, HMC does not challenge the validity of the delegation clause. "As such, the Court must treat it as valid under § 2 of the FAA, and enforce it under § 3 and § 4 of the FAA, leaving any challenge to the validity of the agreement as a whole for the arbitrator. In other words, because [HMC]'s procedural and substantive unconscionability challenges are not specific to the delegation provision, the Court will not consider them." <u>Bernal</u>, 2014 WL 1868787, at *4 (citations omitted).

The Court has found that the parties "clearly and unmistakably" intended to delegate the power to decide arbitrability to an arbitrator. Therefore, the remaining issue is whether Optum's assertion of arbitrability is "wholly groundless." <u>Qualcomm</u>, 466 F.3d at 1371. The "wholly groundless" inquiry allows the district court to prevent a party from "asserting any claim at all, no matter how divorced from the parties' agreement, to force an arbitration." <u>Id.</u> at 1373 n. 5. As set forth in <u>Qualcomm</u>, in conducting this inquiry:

[T]he district court should look to the scope of the arbitration clause and the precise issues that the moving party asserts are subject to arbitration. Because any inquiry beyond a 'wholly groundless' test would invade the province of the arbitrator, whose arbitrability judgment the parties agreed to abide by in the [agreement], the district court need not, and should not, determine whether [plaintiff's claims] are in fact arbitrable. If the assertion of arbitrability is not 'wholly groundless,' the district court should conclude that it is 'satisfied' pursuant to section 3.

466 F.3d at 1374.

Here, the arbitration provision is broad. It provides that all "Disputes" "shall . . . be submitted to binding arbitration . . . in accordance with the Commercial Dispute Procedures of the American Arbitration Association, as they may be amended from time to time . . . ." and broadly defines "Disputes" to include "all questions of arbitrability." Therefore, the Court finds that Optum's contention that HMC's claims against it fall within the scope of the arbitration provision is not "wholly groundless." See Qualcomm, 466 F.3d at 1374.

Accordingly, the question of "arbitrability" of HMC's claims against Optum has been reserved by those two entities for the arbitrator. For this reason, the Court does not address whether HMC's claims against Optum fall outside the scope of the arbitration clause.

c. Unconscionability

Finally, HMC argues that the Optum Provider Agreement is a contract of adhesion and that the arbitration agreement contained in the Optum Provider Agreement is substantively and procedurally unconscionable and, therefore, unenforceable. In accordance with Prima Paint, the Court declines to determine whether the Optum Provider Agreement is itself a contract of adhesion as that question is for the arbitrator, assuming that the arbitration provision is otherwise enforceable.

With regard to whether the arbitration provision is unconscionable, again the Court first considers which jurisdiction's law of unconsionability applies. A district court exercising

diversity jurisdiction must apply the law of the state in which it sits when determining the validity of an arbitration clause. However, where, as here, an arbitration agreement contains a choice-of-law clause, a district court must determine whether to enforce the law chosen by the parties based on the conflict-of-laws rules of the forum state. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). The Optum Provider Agreement contains a choice-of-law provision which provides for the application of California law, and both HMC and Optum cite California case law.

In California, "the core concern of [the] unconscionability doctrine is the absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." <u>Elite Logistics Corp. v. Hanjin Shipping Co.</u>, 2014 U.S. App. LEXIS 17972, at *2 (9th Cir. Apr. 10, 2014). A finding of both procedural and substantive unconscionability is required in California. <u>Elite Logistics</u>, 2014 U.S. App. LEXIS 17972 at *2 (citing <u>Armendariz v. Found. Health Psychcare Servs., Inc.</u>, 24 Cal. 4th 83, 6 P.3d 669, 689-90 (Cal. 2000)). However, courts "utilize[] a sliding scale to determine the ultimate question of unconscionability – greater substantive unconscionability may compensate for lesser procedural unconscionability, and vice versa." <u>Id.</u> For this reason, a Court's task is not only to determine whether each type of unconscionability exists, but more importantly, to what degree each type exists. <u>Parada v. Superior Court</u>, 176 Cal. App. 4th 1554, 1570 (Cal. Ct. App. 2009).

Here, HMC argues that the arbitration provision, assuming it applies to the instant claims, is procedurally unconscionable because (1) it defies HMC's "reasonable expectations" in that (a) it requires all disputes to be submitted to a panel of three arbitrators but does not disclose the costs of that requirement; (b) fails to annex a copy of the Commercial Arbitration Rules of the AAA under which it applies (2) may be unilaterally amended by Optum. As with HMC's

procedural unconscionability arguments with respect to the arbitration provision incorporated into the Caremark Provider Agreement, these arguments are unpersuasive.

With regard to the fact that the arbitration agreement requires all "Disputes" to be submitted to a panel of three arbitrators, HMC's reliance on <u>Parada</u> is misplaced. In that case, investors brought an action against a precious metal dealer for constructive fraud, commodities fraud, and violation of the California unfair competition law (UCL). The dealer moved to compel arbitration. The court construed a three-arbitrator requirement as substantively unconscionable to a high degree, reasoning:

> The requirement of a three-arbitrator panel, the prohibition on consolidation or joinder, and the evidence of the rates charged by JAMS arbitrators and judges evince a high degree of substantive unconscionability in light of the amount of recovery sought by Petitioners. As explained, the cost of a three-arbitrator panel at JAMS for a four-day arbitration would be at least $38,400 plus case management fees of at least $3,200. To arbitrate a claim, each party thus would have to pay at least $20,800, and would have to deposit that amount before the arbitration hearing. Such arbitration costs are prohibitive for losses ranging from $44,000 to $130,000.

176 Cal. App. at 1581. The court, noting that "requiring three arbitrators to resolve a dispute is not always unwarranted, and parties might have good reason to arbitrate before three arbitrators instead of one," found the claims in that case "so complex as to require the joint expertise of three arbitrators." <u>Id.</u>

Here, by contrast, not only is HMC a sophisticated business entity, but its opposition papers assert that "the issues are quite complex" and that HMC anticipates "a minimum of ten hearing days . . . for each arbitration." (Camhi Decl, at ¶ 17.)

Similarly unavailing is HMC's argument that the failure to attach a copy of the AAA rules renders the arbitration provision procedurally unconscionable. "There could be no surprise, as the arbitration rules referenced in the agreement were easily accessible to the parties — the

AAA rules are available on the Internet." Lane v. Francis Capital Mgmt. LLC, 224 Cal. App. 4th 676, 691, 168 Cal. Rptr. 3d 800, 812 (2014). Indeed, here, Section 10.3 of the Optum Provider Agreement itself provides the website where the AAA Rules may be accessed.

In Parada, the court held that the failure to include or attach the governing arbitration rules to the contract might lead an individual customer of the dealer to receive a "nasty shock" upon learning about the amount of fees charged for three arbitrators. 176 Cal. App. 4th at 1572. However, here, HMC, a sophisticated entity, fails to point to a provision of the AAA rules that would have led it to receive a "nasty shock" upon "discovering" that they applied to any disputes.

Finally, the fact that Optum may unilaterally modify the terms of the Optum Provider Agreement, including the arbitration provision, does not, without more, render the arbitration provision procedurally unconscionable. First, as noted above, Section 11.2 governing amendments is found outside of the arbitration provision, and, as such, has no bearing on HMC and Optum's otherwise valid agreement to arbitrate. See Rent-A-Ctr., 561 U.S. at 70 ("a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate"). Further, Optum complied with its contractual obligation to give advance notice to HMC when it amended the Optum Provider Agreement. See Uptown Drug Co. v. CVS Caremark Corp., 962 F. Supp. 2d at 1181.

"Because [HMC] has not shown that the arbitration clause is procedurally unconscionable to any degree, the court need not inquire into whether the agreement is substantively unconscionable, as both procedural and substantive unconscionability must be established for an unconscionability challenge to succeed." Id. at 1182; Kilgore v. KeyBank, Nat. Ass'n, 673 F.3d 947, 964 (9th Cir. 2012)("Because we hold that the arbitration clause in the

parties' contract is not procedurally unconscionable, we need not address whether the terms of that clause are substantively unconscionable.").

For the foregoing reasons, Optum's motion to sever HMC's claims against it and to refer those claims to arbitration of those claims is granted.

As a final matter, the Court renders no determination on whether HMC violated Section 10.9 of the arbitration provision prohibiting class actions.

3. <u>The Prime Arbitration Clause</u>

Section 9.10 of the Prime Provider Agreement provides as follows:

9.10. Arbitration

9.10.1. In the event a dispute between Prime and [Third Party Station] and/or Participating Pharmacy(ies) arises out of or is related to this Agreement, the parties to the dispute will meet and negotiate in good faith to attempt to resolve the dispute.

9.10.2 In the event the dispute is not resolved within thirty (30) days of the date one party sent written notice of the dispute to the other party and if any party wishes to pursue the dispute it will be submitted to binding arbitration in accordance with the rules and procedures of the American Arbitration Association. This arbitration clause will apply to all disputes between the parties that arise out of this Agreement, including those based upon federal and state law. In no event will this arbitration clause be interpreted to allow a class action in arbitration. Unless the parties hereafter mutually agree otherwise, the award of the arbitrators will be final and binding on the parties hereto and judgment upon such award may be entered into a court having jurisdiction thereof. Arbitration under this provision will be conducted in Dakota County, Minnesota. The parties will mutually agree upon an arbitrator. If the parties are unable to agree upon an arbitrator, each party will choose one arbitrator and those two arbitrators will together appoint a third arbitrator. The third arbitrator will then conduct the arbitration process. The arbitrator will have no authority to award any punitive or exemplary damages, to vary or ignore the terms of this Agreement, and will be bound by controlling law.

. . .

(Doc No. 61, at Exh 1.).

As previously mentioned, unlike Caremark and Optum, Prime has not terminated the Prime Provider Agreement. Nonetheless, HMC brings this litigation against Prime, and other PBMs, raising a number of claims, not including breach of contract of the Prime Provider Agreement. Prime has moved to sever HMC's claims against it and to arbitrate those claims. HMC seeks to avoid enforcement of the above-cited arbitration provision on a number of grounds.

     A. <u>Public Policy</u>

HMC advances the same public policy arguments against arbitration of its New York State antitrust claims against Prime that it did unsuccessfully against Caremark and Optum. For the reasons explained above, the Court declines to hold that public policy militates against arbitration of HMC's Donnelly Act claims against Prime.

     B. <u>Scope</u>

HMC also argues that its claims against Prime fall outside the scope of the arbitration provision contained in the Prime Provider Agreement and are, therefore, not "arbitrable." Prime counters, and HMC fails to refute, that by incorporating the AAA Commercial Rules into the arbitration provision, Prime and HMC delegated questions of "arbitrability" to the arbitrator.

Although both the Eight Circuit and district courts in Minnesota have held that incorporation of the AAA Rules into a contract requiring arbitration is a "clear and unmistakable" indication that the parties intended for the arbitrator to decide threshold questions of "arbitrability," <u>Green v. SuperShuttle Int'l, Inc.</u>, 653 F.3d 766, 769 (8th Cir. 2011)(noting the AAA Rules empower the arbitrator to determine his or her own jurisdiction over a controversy between the parties); <u>Ireland v. Lear Capital, Inc.</u>, CIV. 12-2467 (RHK)(TNL), 2012 WL 6021551, at *3 (D. Minn. Dec. 4, 2012)("This Court agrees with this 'great weight of authority'

and determines that inclusion of the AAA Rules in the arbitration clause here clearly and unmistakably shows that the parties intended to let the arbitrator decide issues of arbitrability."), the Court uncovers no court expressly deciding this question as a matter of Minnesota law.

In this situation, the court must act as a New York state court would in predicting how Minnesota courts would rule as to whether the incorporation of the AAA Rules suffices to indicate that an arbitrator should decide questions of "arbitrability." See Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989)("This two-step process of divining the law of the foreign state ... appears to be a consequence both of Klaxon[ Co. v. Stentor Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. d. 1477 (1941)] and of the fundamental tenet of diversity jurisdiction . . . that the federal court is only another court of the State.")(internal quotation and citations omitted). The Second Circuit in Rogers tackled this "uncertain task" by deciding that

> New York courts would, as a matter of substantive interpretation, presume that the unsettled common law of another state would resemble New York's but that they would examine the law of the other jurisdiction and that of other states, as well as their own, in making an ultimate determination as to the likely future content of the other jurisdiction's law.

Id. at 1003. Accordingly, in this case, the Court will presume that Minnesota law will resemble New York law.

The Second Circuit has noted that "New York law [] follows the same standard as federal law with respect to who determines arbitrability: generally, it is a question for the court unless there is "a 'clear and unmistakable' agreement to arbitrate arbitrability." Contec Corp. v. Remote Solution, Co., 398 F.3d 205, 208 n. 1 (2d Cir. 2005)(quoting Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 45-46, 666 N.Y.S.2d 990, 993, 689 N.E.2d 884 (1997)). As noted above, "[v]irtually every circuit to have considered the issue has determined that incorporation of

the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." Oracle, 724 F.3d at 1074.

In accordance with this case law, the Court finds that, by incorporating the AAA Commercial Rules into the arbitration provision, Prime and HMC evinced an intent to delegate questions of "arbitrability" to the arbitrator. For this reason, the Court does not address whether HMC's claims against Prime fall outside the scope of the arbitration clause.

### C.  Unconscionability

HMC also argues that the Prime Provider Agreement is a contract of adhesion and that the arbitration agreement contained in the Prime Provider Agreement is substantively and procedurally unconscionable and, therefore, unenforceable. In accordance with Prima Paint, the Court declines to determine whether the Prime Provider Agreement is a contract of adhesion as that question is for the arbitrator, assuming that the arbitration provision is otherwise enforceable.

With regard whether the arbitration provision is unconscionable, again the Court first considers which jurisdiction's law of unconscionability applies. A district court exercising diversity jurisdiction must apply the law of the state in which it sits when determining the validity of an arbitration clause. However, where, as here, an arbitration agreement contains a choice-of-law clause, a district court must determine whether to enforce the law chosen by the parties based on the conflict-of-laws rules of the forum state. See Klaxon Co., 313 U.S. at 496, 61 S. Ct. 1020, 85 L. Ed. 1477. The Prime Provider Agreement contains a choice-of-law provision which provides for the application of Minnesota law.

The case law concerning unconscionability of contracts under Minnesota law is sparse at best. Yet, "[i]n Minnesota, an unconscionable contract is one which "'no man in his senses and not under delusion would make on the one hand, and . . . no honest and fair man would accept on the other.'" Residential Funding Co., LLC v. Terrace Mortgage Co., 725 F.3d 910, 917 (8th Cir. 2013)(citation omitted). "To establish unconscionability, a party must demonstrate that it had no meaningful choice but to deal with the other party and to 'accept the contract as offered.'" Sports & Travel Mktg., Inc. v. Chicago Cutlery Co., 811 F. Supp. 1372, 1380 (D. Minn. 1993)(citing JM Sales & Mktg. v. Banfi Prods., 546 F. Supp. 1368, 1374–75 (D. Minn. 1982)).

These cases suggest that Minnesota courts blend the concepts of procedural and substantive unconscionability. In any event, with regard to HMC's argument challenging the arbitration clause as procedurally unconscionable, HMC's arguments are in essence directed at the Prime Provider Agreement as a whole, the validity of which Prima Paint instructs should be decided by an arbitrator. Compare M.M. Silta, Inc. v. Cleveland-Cliffs, Inc., 561 F. Supp. 2d 1052, 1057 (D. Minn. 2008)(considering "unconscionability" of the parties' contract, as a whole, where there was no provision for arbitration), aff'd sub nom. M.M. Silta, Inc. v. Cleveland Cliffs, Inc., 572 F.3d 532 (8th Cir. 2009). In other words, HMC makes no argument specifically directed to the negotiations surrounding the arbitration provision found in the Prime Provider Agreement.

However, HMC does make many of the same arguments regarding substantive unconscionability against the Prime Provider Agreement that it did in opposing Caremark and Optum's respective motions to compel arbitration – namely that subjecting it to

arbitration of its claims against Prime would (1) unduly limit its rights to discovery and remedies and (2) be cost prohibitive.

Turning to the question of discovery, unlike with respect to the Caremark Provider Agreement, HMC points to no specific language eliminating, let alone, limiting discovery in arbitration. Rather, HMC essentially mounts a facial challenge to the limited discovery afforded by the AAA Commercial Arbitration Rules. However, the Court declines to credit this wide-reaching challenge, lest all arbitration clauses incorporating the AAA Commercial Arbitration Rules be subject to such scrutiny, at least under Minnesota law. Not only might such a broad holding create uncertainty in the commercial markets, it would run contrary to the well-understood idea that streamlined or limited discovery is a benefit, rather than a drawback, of arbitration.

With regard to remedies, the arbitration provision itself precludes the award of punitive or exemplary damages. In addition, Section 7.4 of the Prime Provider Agreement prohibits the award against Prime of "special, incidental, indirect, exemplary, punitive, or consequential damages, whether based on breach of contract, warranty, tort (including negligence), lost profits or savings, injury to reputation, loss of customers or business, product liability, or otherwise, and whether or not Prime has been advised of the possibility of such damage. The parties acknowledge and agree that the foregoing limitations of liability are a condition and material consideration for their entry into this Agreement." (Doc No. 61, Exh. 1.)

Concededly, this limitation of remedies provision is rather broad. However, as the Court recognized with regard to HMC's claims against Caremark, whether and how this limitation would apply to HMC's claims against Prime, which do

not purport to be based on the contract is a question for the arbitrator, rather than the Court, to resolve. PacifiCare Health Sys., 538 U.S. at 407, 123 S. Ct. 1531, 1536, 155 L. Ed. 2d 578.  In other words, it is not clear that the prohibition on "special, incidental, indirect, exemplary, punitive, or consequential damages" would be applicable to HMC's claims.

Similarly, with regard to the limitation on punitive damages, "because statutory treble-damages provisions [fall] on different points along the spectrum between purely compensatory and strictly punitive awards, it is possible the provisions may not conflict. Second, any potential conflict could be rendered moot because the statutory treble damages are available only if the "defendant willfully or knowingly violated" one of the statutory sections.  Because the availability of treble damages is contingent on the arbitrator's factual findings, it is unclear whether a conflict will arise." MQDC, Inc. v. Steadfast Ins. Co., 12-CV-1424 (ERK)(MDG), 2013 WL 6388624, at *12 (E.D.N.Y. Dec. 6, 2013)(internal citations and quotation marks omitted).

Similarly, the Court declines to strike the other portions of the limitation on remedies, including the prohibition on "lost profits."  First, HMC is not left without any remedy, admittedly able to recover "actual damages," plus injunctive relief.  Second, the provision contained in the arbitration provision applies equally to both parties, who are sophisticated corporate entities, though the Court acknowledges that Section 7.4 is one-sided.  Third, HMC fails to cite, and the Court has not uncovered, a case striking a limitation on damages in an arbitration provision as substantively unconscionable under Minnesota law.  Under these circumstances, the Court declines to find any terms of the arbitration provision to be substantively unconscionable.

Moreover, even if the Court were to find any of the limitation on remedies to be substantively unconscionable, the Court would sever the unconscionable terms under Minnesota law and refer HMC's claims against Prime to arbitration on the remaining terms. Kauffman Stewart, Inc. v. Weinbrenner Shoe Co., 589 N.W.2d 499, 502 (Minn. Ct. App. 1999)("If a court determines that a contract contains an unconscionable clause, it may refuse to enforce the contract, enforce it without the offending language, or limit application of the unconscionable clause "to avoid any unconscionable result.'"), citing Restatement (Second) of Contracts § 208 (1981)).

Finally, for substantially the same reasons the Court rejected HMC's argument that arbitration of its claims against Caremark would be cost prohibitive, the Court rejects HMC's argument that the arbitration of its claims against Prime would be cost prohibitive.

For the foregoing reasons, the Court grants Prime's motion to compel arbitration of HMC's claims against it.

As a final matter, the Court renders no determination on whether HMC violated that part of the arbitration provision prohibiting class actions.

4. As to ESI's Motion to Sever and Transfer HMC's Claims Against It

ESI's motion to sever and transfer HMC's claims against it is predicated upon certain language in a forum selection clause contained in the ESI Provider Agreement which provides, in relevant part:

> All litigation between the parties arising out of or related in any way to the interpretation or performance of the Agreement shall be litigated in the United States District Court for the Eastern District of Missouri, or, as to those lawsuits for which the Federal Court lacks jurisdiction, before a court located in St. Louis County, Missouri.

(Doc No. 11, Exh. C, at § 7.12).  ESI and HMC also agreed that claims arising out of or related in any way to the interpretation or performance of the ESI Provider Agreement would "not be consolidated or coordinated in any action with the Claim of any other individual or entity." Id.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  However, "[b]ecause § 1404 authorizes transfer 'only of the entire action and not of individual claims,' severance must be found appropriate before a transfer may be considered." Steuben Foods, Inc. v. Oystar Grp., 10-CV-780S, 2013 WL 2105894 , at *7 (W.D.N.Y. May 14, 2013).

"The decision whether to grant a severa[nce] motion is committed to the sound discretion of the trial court." Benedith v. Malverne Union Free Sch. Dist., 11-CV-5964 (ADS)(GRB), 2014 WL 4056554, at *45 (E.D.N.Y. Aug. 15, 2014)(citation and quotation marks omitted)(Spatt, J.).

In exercising that discretion, courts typically consider the same general factors elucidating the § 1404(a) analysis. Valspar Corp. v. E.I. DuPont de Nemours & Co., CIV. 13-3214 (RHK)(LIB), 2014 WL 1607584, at *2 (D. Minn. Apr. 21, 2014).  In other words, "[i]f the Court were to conclude [that] the pertinent factors render transfer appropriate under § 1404(a), then severance, too, would be proper." Id.; see e.g., Monje v. Spin Master, Inc., No. CV–09–1713 (PHX)(GMS), 2013 WL 6498073, at *4 (D. Ariz. Dec. 11, 2013)(noting that in these circumstances, "[s]everance is a necessary precursor to . . . transfer, and it is justified by the same reason [s]").

In the "typical case," a district court considering a § 1404(a) motion "must evaluate both the convenience of the parties and various public-interest considerations" to determine whether

transfer is warranted. <u>Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.</u>, ––– U.S. –

–––, 134 S. Ct. 568, 581, 187 L. Ed. 2d 487 (2013). The plaintiff's choice of forum is entitled to

"some weight" in the analysis, and the burden rests with the movant to overcome that weight by

showing (1) the parties' private interests and (2) other public-interest considerations militate in

favor of transfer. <u>Id.</u> at 581 & n. 6.4

 "The calculus changes, however, when the parties' contract contains a valid forum-

selection clause." <u>Id.</u> at 581. In that instance, the plaintiff's choice of forum "merits no weight,"

and a court "should not consider arguments about the parties' private interests," as they

previously agreed (contractually) to litigate in a specified forum. <u>Id.</u> at 581–82. Furthermore, the

plaintiff, as the party flouting the chosen forum, bears the burden of demonstrating that the

public-interest factors merit transfer. <u>Id.</u> at 583. Yet, such factors "will rarely defeat a transfer

motion," and a district court "should ordinarily transfer the case to the forum specified" in the

parties' agreement. <u>Id.</u> at 581–82.

 Here, relying upon the Supreme Court's decision in <u>Atlantic Marine</u>, ESI argues that the

claims against it must be transferred under § 1404(a) and pursuant to the forum selection clause

in the ESI Provider Agreement. HMC responds that (1) the forum selection clause, standing

alone, cannot serve as the basis for severance because its claims do not sound in contract; (2) in

any event, the forum selection clause is permissive rather than mandatory; and (3) public interest

considerations militate in favor of this Court retaining jurisdiction over each of the parties and

their respective claims. None of HMC's contentions in this regard are persuasive.

 "The United States Court of Appeals for the Second Circuit has held that federal law

governs the validity of forum-selection clauses in diversity cases." <u>Sarad, Inc. v. Lawson</u>

<u>Software, Inc.</u>, 04 CIV. 5554 (GEL), 2004 WL 2093512, at *81 n. 2 (S.D.N.Y. Sept. 16,

2004)(citing Jones v. Weibrecht, 901 F.2d 17, 19 (2d Cir. 1990)).  Further, "[t]he Second Circuit has endorsed an expansive reading of the scope of forum selection clauses, in keeping with the public policy favoring their use." Universal Grading Serv. v. eBay, Inc., 08-CV-3557 (CPS), 2009 WL 2029796, at *14 (E.D.N.Y. June 10, 2009); see Russbeer Intern. LLC v. OAO Baltika Brewing Co., No. 07–CV–1212 (CBA), 2008 WL 905044, at *5 (E.D.N.Y. Mar. 31, 2008)("The Second Circuit has consistently held that forum selection clauses are to be interpreted broadly and are not restricted to pure breaches of the contracts containing the clauses."); Roby v. Corp. of Lloyds, 996 F.2d 1353, 1361 (2d Cir. 1993), cert. denied, 510 U.S. 945, 114 S. Ct. 385, 126 L. Ed. 2d 333 (1993)(acknowledging the "strong public policy in favor of forum selection and arbitration clauses" and holding that forum selection clauses encompassing claims "relating to" and "in connection with" investors 'contracts covered investors' securities and RICO claims).

Tellingly, although HMC does not style any of its claims against ESI as a "breach of contract," HMC seeks, among other things, reinstatement of the ESI Provider Agreement *nunc pro tunc*, and, thus, the benefits provided under that agreement.  This requested relief, temporarily obtained through the now-vacated September 11, 2014 TRO, would be meaningless but for the existence of the ESI Provider Agreement and ESI's termination thereof.

Further, where, as here, "[w]hen "arising out of," "relating to," or similar language appears in a forum selection clause, "such language is regularly construed to encompass securities, antitrust, and tort claims associated with the underlying contract." Russbeer, 2008 WL 905044, at *4 (quoting Credit Suisse Sec. (USA) LLC v. Hilliard, 469 F. Supp. 2d 103, 107 (S.D.N.Y. 2007)(citing Roby, 996 F.2d at 1361).   Indeed, a party may not evade a forum selection clause by strategic or "artful" pleading. Weingard v. Telepathy, Inc., No. 05 Civ. 2024 (MBM), 2005 WL 2990645, at *4 (S.D.N.Y. Nov. 7, 2005)("A forum selection clause cannot 'be

defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship.")(citations omitted).

Rather, "[t]o determine if the forum selection clause applies to a particular claim, the Court must examine the claims 'shorn of their labels.'" Allianz Global Corporate & Specialty v. Chiswick Bridge, No. 13–cv–7559 (RA), 2014 WL 4674644, at *4 (S.D.N.Y. Sept. 19, 2014)(quoting Phillips v. Audio Active Ltd., 494 F.3d 378, 389-90 (2d Cir. 2007). "This approach is consistent with the focus on factual allegations rather than on the causes of action asserted when deciding whether [a forum selection clause] applies to particular claims." Phillips, 494 F.3d at 388-89.

Applying that standard, a close reading of the complaint indicates that HMC's allegations against ESI are "integrally related" to the ESI Provider Agreement. Roby, 996 F.2d at 1361.

In addition to seeking the reinstatement of the ESI Provider Agreement, HMC seeks to enjoin ESI, and the other Defendants, from "[r]efusing to process and pay claims for payment submitted by HMC for compounded medications prescribed by physicians for their patients who have prescription drug benefits administered by a defendant." (Compl. at ¶ 106(b))

HMC further alleges, as part of its Section 349 claim, that ESI terminated the ESI Provider Agreement based on "deceptive" pretenses. (Id. at ¶ 88.) HMC also alleges, as part of its unfair insurance practices claim, that ESI "impos[ed] impossible hurdles for independent compound pharmacies to process compound drug claims." (Id. at ¶ 102.)(emphasis added). In the Court's view, the processing of compound drug claims by ESI arises out of or is related to the ESI Provider Agreement. For this reason, the Court rejects HMC's argument that its claims

against ESI fall outside the scope of the forum selection clause contained in the ESI Provider Agreement.

Similarly unavailing is HMC's argument that the forum clause is permissive, rather than mandatory, on the basis (1) that the word "shall," standing alone, does not make it mandatory and/or because (2) it lacks language indicating an "exclusive" forum.

On the first contention, HMC omits the language "be litigated" after "shall" in the forum selection clause, which, read together, reinforces the mandatory quality of the forum selection clause. See Macsteel Int'l USA Corp. v. M/V Larch Arrow, Her Engines, Boiler, Etc., 354 Fed. Appx. 537, 538, 40 (2d Cir. 2009)(holding that a clause stating "[a]ny disputes arising under the Bill of Lading to be decided in London" was mandatory on the basis of the phrase "to be").

On the second contention, it is true that, in Salis v. Am. Exp. Lines, 331 F. App'x 811, 813 (2d Cir. 2009)(summary order), the Second Circuit reasoned that "[w]hether a forum selection clause is mandatory depends on its language, and generally courts will not enforce a clause that specifies only jurisdiction in a designated court without any language indicating that the specified jurisdiction is exclusive." Id. at 813. However, it does not follow that the word "exclusive" is a magic signal conferring mandatory jurisdiction, or that there are any particular magic words. See Madsen v. RBS Citizens, NA., No. 3:13–CV–00357 (CSH), 2013 WL 2367836, at *5 (D. Conn. May 29, 2013)(holding that a forum selection clause which provided that any dispute "shall be resolved by a Court of competent jurisdiction sitting in Providence, Rhode Island" was mandatory, not permissive); Tecfolks, LLC v. Claimtek Sys., 906 F. Supp. 2d 173, 177 (E.D.N.Y. 2012)(holding that a forum selection clause which provided that "the forum and place of any dispute and resolution of any dispute, relating to or arising out of this contract,

shall be in the State of California" was mandatory, not permissive); Fed. Ins. Co. v. M/V Ville D'Aquarius, No. 08 Civ. 8997 (PKC), 2009 WL 3398266, at *5 (S.D.N.Y. Oct. 20, 2009)(holding that a forum selection clause which provided that any dispute "shall be determined by the English laws and any action against the Carrier shall be brought before the Court of Admiralty" was mandatory, not permissive); Indem. Ins Co. of N. Am. v. K-Line Am., Inc., 2008 WL 4922327, at *7 (S.D.N.Y. Feb. 27, 2008)(holding that forum selection clause which provided that any dispute "shall be brought before the Tokyo District Court" was mandatory, not permissive); Indem. Ins Co. of N. Am. v. M/V Easline Tianjin, Nos. 07 CV 959(RPP), 07 CV 6008(RPP), 2008 WL 418910, at *3 (S.D.N.Y. Feb 14, 2008)(holding that forum selection clause which provided that any dispute "shall be determined by the court in the People's Republic of China" was mandatory, not permissive); Eklecco L.L.C. v. Rainforest Café, Inc., No. 02–CV–0182, 2002 WL 1428924, at *2 (N.D.N.Y. June 12, 2002)(holding that forum selection clause which provided that any dispute "shall be brought in the New York Supreme Court, Onondaga County" was mandatory, not permissive).

Consistent with the foregoing cases, the Court finds that the forum selection clause contained in the ESI Provider Agreement is mandatory.

Finally, as noted above, HMC argues that enforcing the forum selection clause against it would be "unreasonable and unjust" because the Plaintiffs are located in New York and a transfer would result in inefficiencies. However, in Atl. Marine, the Supreme Court held that such "private interests" play no role in determining whether to transfer a case based on a forum selection clause. 134 S. Ct. at 582. It concluded that "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient

for themselves or their witnesses, or for the pursuit of the litigation." Id. Rather, "a court evaluating a defendant's § 1404(a) motion to transfer based on a forum selection clause . . . may consider arguments about public-interest factors only."

In addition, the efficiency and economy achieved by trying interrelated claims in one forum should not trump the forum-selection clauses agreed to by HMC and ESI. See e.g., 1–Stop Fin. Serv. Ctrs. of Am., LLC v. Astonish Results, LLC, No. A–13–CA–961, 2014 WL 279669, at *6 (W.D. Tex. Jan. 23, 2014)(argument that severance and transfer of related claims "would result in an 'egregious waste of judicial resources' " did not "rise to a level sufficient to deny a motion to transfer"). In fact, the efficiency and economy that could be achieved by a single trial would largely inure to HMC's benefit — precisely what the Supreme Court has counseled is not a relevant consideration. Atl. Marine, 134 S. Ct. at 582 (a court "should not consider arguments about the [plaintiff's] private interests"); see also Excentus Corp. v. Giant Eagle, Inc., Civ. A. No. 13–178, 2014 WL 923520, at *10 (W.D. Pa. Mar. 10, 2014).

In the Court's view, the report and recommendation in Aquila v. Fleetwood, R.V, Inc., 12-CV-3281 (LDW)(GRB), 2014 WL 1379648 (E.D.N.Y. Mar. 27, 2014), relied upon by HMC and adopted by the district court in that case, is distinguishable. There, the plaintiff sued a manufacturer, a retailer, and repairer of a recreation vehicle for alleged defects in the vehicle. The retailer moved to dismiss on the basis of a forum selection clause in a contract between it and the plaintiff, which designated Florida state courts as the exclusive *fora* for disputes between them. United States Magistrate Judge Gary R. Brown recommended that the district court deny the retailer's motion to dismiss, reasoning that "the public interests in avoiding duplicative proceedings and potentially inconsistent results, significantly outweigh the private interest in litigating a portion of this dispute in Florida." Id. at *5.

Here, as in <u>Aquila</u>, there are overlapping claims against multiple defendants. However, unlike in <u>Aquila</u>, the decision whether to grant or deny the motion to sever and transfer, by itself, will have a marginal impact on judicial economy. This is because, unlike in <u>Aquila</u>, the remaining defendants – namely Caremark, Optum, and Prime – seek to compel arbitration of HMC's claims against each of them based on provisions contained in their respective contracts with HMC. As explained above, the Court is duty-bound to refer those claims to arbitration. Therefore, regardless of how the Court resolve's ESI's motion to sever and transfer, the claims against Caremark, Optum, and Prime may be resolved outside of a judicial forum. Further, the Court notes that, if the claims against HMC's Caremark, Optum, and Prime are ultimately resolved through arbitration, the costs of such dispute resolution would be borne by the relevant parties rather than by the taxpayer. Finally, the Court notes that the parties have already briefed the issue of "arbitrability" of the underlying claims, and need not incur significant additional expense resolving that issue.

Based on the foregoing, the Court grants ESI's motion to sever HMC's claims against it pursuant to Fed. R. Civ. P. 21 and transfer those claims to the United States District Court for the Eastern District of Missouri, pursuant to 28 U.S.C. § 1404(a), and the forum selection clause in the ESI Provider Agreement.

As a final matter, the Court renders no determination on whether HMC violated the provision of the forum selection clause prohibiting "consolidat[ing] or coordinat[ing]" claims against ESI "in any action with the [c]laim of any other individual or entity."

5. <u>The Remaining Claims are Stayed Pending Arbitration</u>

The FAA provides that "upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which the suit is pending, upon being satisfied that the

issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement [.]" 9 U.S.C. § 3; <u>see generally</u> <u>Carvant Fin. LLC v. Autoguard Advantage Corp.</u>, 958 F. Supp. 2d 390, 398 (E.D.N.Y. 2013)(applying Section 3 of the FAA).

Here, Caremark, Optum, and Prime separately move to stay the litigation of the Individual Plaintiff's claims, which are, without dispute, not subject to any arbitration or forum selection clause. The Individual Plaintiffs, represented by the same counsel as HMC, have submitted no response to this request, and the request is otherwise meritorious. Therefore, the Court stays the entire action, including HMC's claims against Caremark, Optum, and Prime, pending arbitration.

The Court notes that while it is directing that HMC submit its claims against Caremark, Optum, and Prime, it makes no determination as to whether those claims are, in fact, "arbitrable" under the respective arbitration clauses – that is a determination that the parties have respectively delegated to the arbitrator to make. In other words, if one of the arbitrators finds that the claims fall outside the scope of the arbitration clause and/or that the contracts are ones of adhesion, HMC can move to lift the stay as to those clams.

6. The October 3, 2014 TRO

As the claims brought by the Individual Plaintiffs are stayed, so is the October 3, 2014 TRO as to them, which remains in place.

With regard to HMC, as noted above, on October 14, 2014, HMC requested a conference with the Court to seek clarification of the October 3, 2014 TRO as applicable to it, or to set a

schedule for a formal contempt motion against the Defendants for their alleged failure to comply with the October 3, 2014 TRO.

The Court denies this motion without prejudice, declining to revisit the terms of the October 3, 2014 TRO as to HMC except to the extent it extends that TRO as explained below. In this regard, the Court notes that HMC's request for injunctive relief against Caremark, Optum, and Prime are "wholly derivative" of the claims asserted in the complaint, Uptown Drug, 962 F. Supp. 2d at 1187, which may or may not be "arbitrable." The Court further notes that nothing in the respective arbitration clauses prohibits the arbitrator from awarding injunctive relief. Therefore, HMC's request for injunctive relief against Caremark, Optum, and Prime may be addressed in arbitration. In the event the arbitrator(s) find that any of HMC's claims against Caremark, Optum, and Prime are not "arbitrable," then HMC may seek to lift the stay in this Court as to those claims and seek injunctive relief.

To be sure, it does not follow that the October 3, 2014 TRO as to HMC should be vacated pending arbitration. Rule 65 of the Federal Rules of Civil Procedure authorizes extensions of TROs under certain conditions. Rule 65 provides:

> [t]he order expires at the time after entry – not to exceed 14 days – that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension.

Fed. R. Civ. P. 65(b)(2); Pre-Paid Legal Servs., Inc. v. Smith, CIV-11-333 (FHS), 2011 WL 4862429, at *3 (E.D. Okl. Oct. 13, 2011)(extension of TRO in the context of arbitration proceedings warranted upon showing of good cause).

In addition, "a district court may issue interim injunctive relief on arbitrable claims to preserve the *status quo* pending arbitration." United Ins. Co. v. World Wide Web, 11-CV-1177 (CBA)(JMA), 2011 WL 1870599, at *2 (E.D.N.Y. Apr. 27, 2011)(italics added), report and

recommendation adopted sub nom. United Ins. Co. v. World Wide Re, 11-CV-1177

(CBA)(JMA), 2011 WL 1843280 (E.D.N.Y. May 16, 2011)(citing Blumenthal v. Merrill Lynch,

Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1053 (2d Cir. 1990)).  Although it is not been

decided yet whether HMC's claims against Caremark, Optum, and Prime are "arbitrable,"

nothing prevents the Court from awarding interim injunctive relief, as it did through the October

3, 2014 TRO, pending that determination.

Here, based on HMC's initial TRO papers and other submissions, the Court concludes

that is necessary to protect the *status quo*.  Therefore, the Court extends the TRO as against

Caremark, Optum, and Prime until such time as the respective arbitrator hears and determines

any application for injunctive relief.

### III.     CONCLUSION

In sum, the Court denies Caremark's motion to strike in its entirety Camhi's declaration

submitted in support of HMC's opposition to Caremark's motion to sever HMC's claims against

Caremark and to compel arbitration of those claims. (Doc No. 91).

The Court grants in part and denies in part Caremark's motion to sever HMC's claims

against it and to compel arbitration of those claims (Doc No. 29).  In particular, the Court finds

that public policy does not militate against arbitration of HMC's Donnelly Act claims against

Caremark.  The Court declines to address the "arbitrability" of HMC's claims against Caremark,

as HMC and Caremark reserved that question for the arbitrator.  Therefore, to be clear, the Court

is referring HMC's claims to arbitration rather than "compelling" arbitration of those claims.

The Court also finds that HMC has failed to establish that the arbitration provision incorporated

into the Caremark Provider Agreement is procedurally unconscionable under Arizona law.

However, the Court finds that the limitation on discovery in that arbitration provision is

substantially unconscionable under Arizona law and strikes that term. The Court finds HMC's remaining arguments regarding substantive unconscionability to be without merit. For this reason and because the Court finds that the substantively unconscionable discovery provision does not permeate the arbitration provision, the Court directs HMC to submit its clams against Caremark to arbitration in accordance with the remaining terms of the arbitration provision.

The Court grants in part and denies in part Optum's motion to sever HMC's claims against it and to compel arbitration of those claims. (Doc No. 38). In particular, as with HMC's claims against Caremark, the Court finds that public policy does not militate against arbitration of HMC's Donnelly Act claims against Optum. The Court declines to address the "arbitrability" of HMC's claims against Optum, as HMC and Optum reserved that question for the arbitrator. Therefore, the Court is referring HMC's claims to arbitration rather than "compelling" arbitration of those claims. The Court finds that HMC has failed to establish that the arbitration provision in the Optum Provider Agreement is procedurally unconscionable under California law. The Court declines to address whether HMC has established that any of the provisions of that arbitration provision are substantively unconscionable under California law.

The Court also grants in part and denies in part Prime's motion to sever HMC's claims against it and to compel arbitration of those claims. (Doc No. 59.) In particular, as with HMC's claims against Caremark and Optum, the Court finds that public policy does not militate against arbitration of HMC's Donnelly Act claims against Prime. The Court declines to address the "arbitrability" of HMC's claims against Prime, as HMC and Prime reserved that question for the arbitrator. Therefore, the Court is referring HMC's claims to arbitration rather than "compelling" arbitration of those claims. Finally, the Court finds that HMC has failed to establish that the arbitration provision in the Prime Provider Agreement is procedurally or

substantively unconscionable under Minnesota law, to the extent that jurisdiction distinguishes between the two forms of unconscionability.

The Court grants ESI's motion to sever HMC's claims against it and transfer those claims to the United States District Court for the Eastern District of Missouri, pursuant to 28 U.S.C. § 1404(a) and the forum selection clause in the ESI Provider Agreement. (Doc No. 11). In particular, the Court finds that (1) the forum selection clause encompasses ESI's extra-contractual claims; (2) the clause is mandatory rather than permissive; and (3) the public interests in avoiding duplicative proceedings and potentially inconsistent results do not significantly outweigh the private interest in litigating a portion of this dispute in Missouri.

The Court stays the entire action, including the claims brought by the Individual Plaintiffs, pursuant to Section 3 of the FAA.

The Court denies HMC's letter motion dated October 14, 2014 (Doc No. 99) without prejudice for the reasons explained in Part II(6) of this Memorandum of Decision and Order.

Finally, that part of the October 3, 2014 TRO applicable to the Individual Plaintiffs will remain in place pending arbitration, and that part of the October 3, 2014 TRO applicable to HMC is extended until such time as the respective arbitrator hears and determines any application for injunctive relief. Any requests to revisit the terms should be directed to the appropriate arbitrator, or, with respect to ESI, the federal district court in Missouri.

The Court recognizes that severing HMC's claims against Caremark, Optum, and Prime and submitting them to arbitration and severing and transferring HMC's claims against ESI to the federal district court in Missouri may lead to inconsistent results. Further, if one or more of the arbitrators deems the relevant Provider Agreement to be contracts of adhesion or finds that

HMC's respective claims are not "arbitrable," HMC would only have the opportunity to start at square one in this Court.

"It is always more expeditious to try related claims in one forum rather than several, but allowing efficiency and economy to rule the day would effectively swallow Atlantic Marine's holding in every case with multiple defendants." Valspar Corp., 2014 WL 1607584, at *4. Furthermore, the Court finds that HMC, a sophisticated corporate entity, assumed these risks when it entered into the relevant arbitration provisions and forum selection clause.

**SO ORDERED**.

Dated: Central Islip, New York
October 27, 2014

_／Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge